# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MELVIN DAVIS and DAKOTA KING, individually and on behalf of all others similarly situated,

               Plaintiffs,

    v.

MAGNA INTERNATIONAL OF AMERICA, INC., et al.,

               Defendants.

Case No. 2:20-cv-11060-NGE-RSW

Hon. Nancy G. Edmunds

Magistrate R. Steven Whalen

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

I.   COUNTER-STATEMENT OF MATERIAL FACTS ...............................1

   A. Overview of the Plan.............................................................1

   B. The Totality of the Circumstances Demonstrates Defendants
      Implemented an Imprudent Process In Their Administration of the
      Plan   .................................................................................2

      i.   Defendants Breached Their Fiduciary Duties in Failing to
           Investigate and Select Lower Cost Alternative Funds....................2

      ii.  Defendants Failed to Utilize Lower Cost Passively Managed and
           Actively Managed Funds ...............................................5

      iii. Defendants Failed to Monitor or Control the Plan's
           Recordkeeping Expenses ...............................................6

      iv.  Defendants Breached Their Duty of Loyalty to the Plan and its
           Participants .............................................................11

      v.   Defendants Failed to Document A Prudent Process in the
           Meeting Minutes.......................................................13

II.  LEGAL STANDARD ...............................................................13

   A. Summary Judgment Standard...............................................13

   B. ERISA's Prudence Standard .................................................14

III. ARGUMENT.........................................................................15

   A. Defendants Failed to Prudently and Loyally Monitor the Plan's
      Investments and Recordkeeping Fees .................................15

      1.   There is Ample Evidence Defendants Failed to Select the
           Identical Lower-Cost Share Class in Violation of ERISA ...........16

      2.   The Evidence Demonstrates Defendants Failed to Implement a
           Prudent Process for Monitoring Recordkeeping Fees .................19

3.  Defendants Breached Their Duty of Loyalty to the Plan's Participants ........................................................................23

4.  Plaintiffs' Claim for Breach of Defendants' Duty to Monitor Should Proceed to Trial ..............................................24

5.  Defendants' Resort to the Advice of Non-Fiduciaries Fails ........24

IV.   CONCLUSION ...........................................................................25

# <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**Cases**

*Baird v. Blackrock Inst. Tr. Co., N.A.*,
2021 WL 105619 (N.D. Cal. Jan. 12, 2021) ............................................................22

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
2019 WL 387214 (S.D. Ind. Jan. 30, 2019) ............................................................19

*Board of Trs. of S. California IBEW-NECA Defined Contribution Plan
v. Bank of N.Y. Mellon Corp.*,
2011 WL 6130831 (S.D.N.Y. Dec. 9, 2011) ............................................................14

*Cassell v. Vanderbilt Univ.*,
285 F.Supp.3d 1056 (M.D. Tenn. 2018) ..................................................................23

*Cates v. Trs. of Columbia Univ. in City of New York*,
2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019) .....................................................13, 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................................13

*Creamer v. Starwood Hotels & Resorts Worldwide, Inc.*,
2017 WL 2992739 (C.D. Cal. May 11, 2017) ........................................................20

*Cryer v. Franklin Resources, Inc.*, No. 16-cv- 04265-CW,
2018 WL 6267856 (N.D. Cal. Nov. 16, 2018) ...................................................14, 16

*Cunningham v. Cornell Univ.*,
2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ........................................................21

*Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Trust I 2007-1 v.
Morgan Stanley Mortgage Capital Holdings, LLC*,
289 F.Supp.3d 484 (S.D.N.Y. 2018) .......................................................................22

*Donovan v. Mazzola*,
716 F.2d 1226 (9th Cir. 1983) .................................................................................25

iii

*Feinberg v. T. Rowe Price Group, Inc.*,
2021 WL 488631 (D. Md. Feb. 10, 2021) .........................................................14, 16

*George v. Kraft Foods Glob., Inc.*,
641 F.3d 786 (7th Cir. 2011) ....................................................................16, 21, 22

*Johnson v. Providence Health & Serv.*,
2018 WL 1427421 (W.D. Wash. March 22, 2018) ..................................................23

*Isom v. Ramsey*,
2009 WL 3172100 (W.D. Ky. Sept. 29, 2009) .......................................................13

*Leber v. Citigroup 401(k) Inv. Comm.*,
129 F. Supp.3d 4, 14 (S.D.N.Y. 2015) ..................................................................17

*Liss v. Smith*,
991 F. Supp. 278 (S.D.N.Y. 1998) ..................................................................20, 21

*Martin v. Consultants & Adm'rs, Inc.*,
966 F.2d 1078 (7th Cir. 1992) .............................................................................21

*Moreno v. Deutsche Bank of Americas Holding Corp.*,
2018 WL 2727880 (S.D.N.Y. June 6, 2018) .........................................................22

*Pension Fund-Mid Jersey Trucking Industry-Local 701 v. Omni Funding Group*,
731 F. Supp. 161 (D.N.J. 1990) ...........................................................................14

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Center*,
712 F.3d 705 (2d Cir. 2013)..................................................................................15

*R. & R. adopted*,
2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020) .......................................................13

*Ramos v. Banner Health*,
2019 WL 1777524 (D. Colo. Apr. 23, 2019)..........................................................17

*Reetz v. Lowe's Cos., Inc.*,
2021 WL 535160 (W.D.N.C. Feb. 12, 2021) .........................................................14

*Sacerdote v. New York Univ.*,
9 F.4th 95 (2d Cir. 2021) ........................................................................15

*Sims v. BB&T Corp.*,
2018 WL 3128996 (M.D.N.C. June 26, 2018) ........................................16

*Stegemann v. Gannett Co., Inc.*,
970 F.3d 465 (4th Cir. 2020) ..................................................................17

*Terraza v. Safeway Inc.*,
2019 WL 1589979 (N.D. Cal. Mar. 6, 2019)...........................................20

*Tibble v. Edison Int'l*,
135 S. Ct. 1823 (2015) .............................................................................13

*Tibble v. Edison, Int., et al*
843 F.3d 1187 (9th Cir. Dec 30, 2016) .......................................16, 17, 19

*Town of Southold v. Town of E. Hampton*,
477 F.3d 38 (2d Cir. 2007).......................................................................22

*Troudt v. Oracle Corp.*,
2017 WL 1100876 (D. Col. Mar. 22, 2017) ............................................18

*Tussey v. ABB, Inc.*,
746 F.3d 327 (8th Cir. 2014) .......................................................14, 19, 20

*In re Unisys Sav. Plan Litig.*,
74 F.3d 420 (3d Cir. 1996)................................................................24, 25

## Statutes

Fed. R. Civ. P. 56(c)................................................................................13

29 U.S.C. § 1104(a)(1).............................................................................13

## Other Sources

The Employee Retirement Income Security Act of 1974...........................7

v

## ISSUES PRESENTED

1.      Whether the undisputed facts show that Defendants failed to implement and engage in a prudent process for monitoring the Plan's investment options.

Suggested Answer: **Yes.**

2.      Whether the undisputed facts show that Defendants failed to implement and engage in a prudent process for monitoring the Plan's recordkeeping fees.

Suggested Answer: **Yes.**

3.      Whether the undisputed facts show that Defendants administered the Plan in such a way that was disloyal to the Plan's participants.

Suggested Answer: **Yes.**

4.      Whether the undisputed facts show that Defendants failed to adequately monitor the Committee in its administration of the Plan.

Suggested Answer: **Yes.**

## <u>CONTROLLING  AND/OR MOST APPROPRIATE AUTHORITIES</u>

*Sims v. BB&T Corp.*, 2018 WL 3128996, at *8 (M.D.N.C. June 26, 2018)

*Tibble v. Edison, Int., et al*, 843 F.3d 1187, 1198 (9th Cir. Dec 30, 2016)

*Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015)

*Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)

Plaintiffs Melvin Davis and Dakota King (hereinafter, "Plaintiffs"), by and through their attorneys, respectfully submit this Opposition to Defendants'[1] Motion for Summary Judgment.[2]   The evidence in this case overwhelmingly demonstrates that Defendants breached their fiduciary duties to the Plan[3] and its participants.  This reality is a far-cry from Defendants' assertion that there are no "disputed facts" that Defendants followed a prudent process.  Defs. Mem. at 1.  The opinions of Plaintiffs' experts Michael Geist, Eric C. Dyson, and Cynthia L. Jones, coupled with the deposition testimony of the Committee members and the close to 50,000 pages of documents produced by Defendants demonstrate that Defendants implemented an imprudent process in their management of the Plan.

## I.      COUNTER-STATEMENT OF MATERIAL FACTS

### A. Overview of the Plan

Principal Financial Group ("Principal") provided recordkeeping and administrative services to the Plan from January 1, 2014 through the present.  (Ex.

---

[1] "Defendants" refers to Magna International of America, Inc. ("Magna"), The Board of Directors of Magna International of America, Inc. (the "Board"), and the Magna International of America, Inc. Investment Committee and the United States Pension and Retirement Savings Committee (the "Committee").

[2] Defendants' Brief In Support of Their Motion for Summary Judgment (ECF No. 48) is referred to herein as "Defs. Mem."

[3] "Plan" refers to the Magna Group of Companies Retirement Savings Plan.  All capitalized and undefined terms used herein shall have the same meanings ascribed to them in the Complaint ("Cmplt.") (ECF No. 1).

31, Defendants' Responses and Objections to Plaintiffs' First Request for Admissions Directed to all Defendants) ("Defs. Resp. to Plf's Req, for Admissions"); (Ex. 7, Principal Agreement at 6931-6972)).[4] Principal also provided certain investment advisory services to the Plan from January 1, 2014 through February 14, 2021.  (Ex. 30, Defs. Resp. to First Interrog.).  During the Class Period, the Plan offered the Principal LifeTime Hybrid Collective Investment Trust ("CIT") Target Date Funds ("TDFs") and other mutual funds.  (Ex. 1, Jones, ¶ 11; Ex. 7, Jones Suppl. ¶¶ 10-11).

### B. The Totality of the Circumstances Demonstrates Defendants Implemented an Imprudent Process In Their Administration of the Plan

#### i. Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds

During the Class Period, the Plan offered a suite of Principal Trust Target Date Funds (TDFs) known as the Principal LifeTime Hybrid Suite CITs.  (Ex. 2, Dyson, ¶ 15).  TDFs were the default investment for the Plan so participants who did not give investment direction for their individual accounts were automatically invested in the TDFs.  (Ex. 2, Dyson, ¶ 58; Ex 9, Plan Highlights at 354).  At all times during the Class Period, Principal offered a lower cost share class of the Principal LifeTime Hybrid CITs that were available to the Plan.  Cmplt. at ¶¶ 89, 91.  Yet, the Plan's

---

[4] All Exhibits ("Ex.") are attached to the Declaration of Mark K. Gyandoh, which is filed contemporaneously with this opposition.

fiduciaries failed to provide the lower cost share class.  (Ex. 31, Defs. Resp. to Plf's Req, for Admissions).

The TDFs in the Plan were subjected to a disproportionately large portion of revenue share compared to the Plan's other investment options.  (Ex. 2, Dyson, ¶ 15).  Revenue sharing is another method used to pay recordkeeping costs that involves an added expense built into the menu of investment offerings.  (Ex. 2, Dyson, ¶ 32).  Revenue sharing results in the plan participants paying for the cost of recordkeeping by way of a reduced return on their investment due to a higher cost.  (Ex. 2, Dyson, ¶ 32).  During the Class Period, revenue sharing was applied in such a way that different funds in the Plan have different levels of revenue share and the Plan participants were not paying an equitable amount.  (Ex. 2, Dyson, ¶ 53; Ex. 10, 9/2/17 Plan Fee Summary at 6168-6169).   This claim is encompassed in the Complaint's revenue sharing allegations.  Cmplt, ¶¶ 95-97.  In 2019, for example, the total value of the TDF assets in the Plan was $600,450,823 and of the $1,619,132 paid in revenue share that same year, $1,200,902 was paid from the TDFs.  (Ex. 2, Dyson, ¶ 54).  Thus, the TDF's represented 41.42% of assets, but paid 74.17% of the Plan's revenue share.  (*Id.*)  The Diversified International Separate Account was another fund subjected to a significantly higher revenue share amount compared to other funds.  (Ex. 2, Dyson, ¶ 54).  Plan participants invested in the TDFs or the

Diversified International Separate Account were subject to a much higher amount of fees than participants invested in other options.  (Ex. 2, Dyson, ¶ 54 and Appx. III).

Additionally, the Plan not only used revenue share to pay for recordkeeping services, but also for ERISA Budget expenses and the Wilshire 3(21) service.  (Ex. 2, Dyson, ¶ 65).  An August 8, 2017 email from Jose Bustamante of Magna to several members of Principal details that the Plan paid hardship and termination withdrawal fees for Plan participants from the ERISA Budget.  (Ex. 2, Dyson, ¶ 66; Ex. 11, 8/14/17 Email at 19646).   While most participants paid for contributions to the ERISA Budget through revenue sharing, only participants who made a withdrawal from an account due to termination or hardship received a benefit from this particular use of dollars in the ERISA Budget.  (Ex. 2, Dyson, ¶ 66).

The evidence demonstrates the Committee members lacked a thorough understanding of Plan revenue share to the extent necessary to apply it to the Plan in an equitable manner.  (Ex. 2, Dyson, ¶ 52; Ex 4, Wolkove 147:12-150:2; Ex. 5, Charbonneau 157:21-158:3; Ex. 6, Brock 86:20-87:4).  In a January 18, 2017 email from Mr. Charbonneau to Mr. Bustamante, Mr. Charbonneau stated: "I'm not familiar with the revenue sharing as a fee payment concept."  (Ex. 3, Geist, ¶ 343; Ex. 28, 1-18-17 Email at 18289).  When asked if the TDF share classes in the Plan were the lowest price share class available, Mr. Charbonneau answered, "No I don't know.  What I do know is that we have a certain amount of revenue that we had to

4

cover, so as long as we – you know, as long as we recover that revenue from somewhere, then that's the objective." (Ex. 2, Dyson, ¶ 57; Ex. 5, Charbonneau 158:6-10). In 2020, revenue share was eliminated from the Plan and replaced with an asset-based fee of 0.06%. (Ex. 2, Dyson, ¶ 53; Ex 12, 10-29-20 Plan Fee Summary at 7592). Mr. Charbonneau agreed that eliminating revenue sharing "takes away some layers of complexity," made expenses "a little more transparent," and is "more equitable." (Ex. 2, Dyson, ¶ 56; Ex. 5, Charbonneau 149:16-23).

The evidence also demonstrates the TDFs were not evaluated consistent with the Department of Labor ("DOL")'s guidance. (Ex. 2, Dyson, ¶ 68). The Plan fiduciaries testified they were not familiar with the DOL guidance. (Ex. 2, Dyson, ¶ 68; Ex. 4, Wolkove 53:14-54:7). It was not until March 2021 that the Plan fiduciaries finally conducted a review of the Principal TDF suite by way of an Investment Review provided by CAPTRUST. (Ex. 2, Dyson ¶ 70; Ex. 13, 1/17/2021 CAPTRUST at 7235). As such, the Plan sustained an estimated $1.8 to $12.8 million in damages due to the selecting of the higher cost share class of the TDFs. (Ex. 1, Jones, ¶ 24).

### ii. Defendants Failed to Utilize Lower Cost Passively Managed and Actively Managed Funds

During the Class Period, the Plan fiduciaries did not consistently consider the performance of the Plan's actively managed and hybrid funds compared to other active funds with lower expense ratios. (Ex. 2, Dyson, ¶ 77). Even Mr. Charbonneau

acknowledged that passive funds cost less and are less risky while actively managed funds cost more and underperform.  (Ex. 2, Dyson, ¶ 77; Ex. 5, Charbonneau Dep. 24:4-15).  Failure to consider lower fee alternatives to the Plan's funds resulted in damages as of $2.5 million.  (Ex. 7, Jones Suppl. Report, ¶ 11).

### iii. Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses

The evidence shows that the Committee failed to implement and follow a prudent process with respect to monitoring the Plan's recordkeeping and administrative fees.  Defendants attempt to improperly proffer facts regarding the Committee's actions prior to the start of the proposed Class Period, Defs. Mem. at 20, but such actions or omissions – even if indicative of a prudent process – do not excuse Defendants' failure to monitor the Plan's recordkeeping fees during the Class Period.

Recordkeepers generally offer the same range of services.  (Ex. 3, Geist, ¶¶ 44-45).  The Plan paid an average per participant recordkeeping fee of $73 during the Class Period, which was more than double what the average reasonable fee should have been.  (Ex. 3, Geist, ¶ 382).  Plan Participants lost $9,262,519 as a result of unreasonable recordkeeping fees.  (Ex. 3, Geist, ¶ 408).  During the Class Period, "the Plan had, and still has, substantial leverage when negotiating with Principal," based on, among other things, its considerable size in both participant numbers and assets.  (Ex. 3, Geist, ¶¶ 407, Appx. A).  Yet, Defendants failed to use the Plan's

leverage to negotiate lower recordkeeping fees.  (Ex. 3, Geist, ¶ 313; Ex. 4, Wolkove

145:22-146:2).

The Plan's IPS directs, "The Investment Committee will review disclosures

provided by covered providers under ERISA Section 408(b)(2)."  (Ex. 2, Dyson, ¶

16; Ex. 14, Investment Policy Statement at 6559).   The deposition testimony

demonstrates the Committee members lacked familiarity with the fee disclosure

requirements of section 408(b)(2) of ERISA.   (Ex. 3, Geist, ¶¶ 347; Ex. 5,

Charbonneau at 55:17-55:19; Ex. 4, Wolkove 53:5-12; Ex. 2, Dyson Report ¶ 59;

Ex. 4, Wolkove Deposition 53:5-12; Ex. 5, Charbonneau Deposition 55:17-56:4).

Similarly, there is no documentation confirming that the Plan's fiduciaries

thoroughly reviewed the 408(b)(2) disclosures or utilized such information to

negotiate the fees with Principal.  (Ex. 2, Dyson, ¶¶ 59).  In fact, Mr. Charbonneau,

a member of the Committee since 2016, testified that during his time on the

committee, recordkeeping fees had never been negotiated with Principal.  (Ex. 2,

Dyson, ¶ 60; Ex. 5, Charbonneau Deposition 132:22-133:2).

Throughout the Class Period, the Plan's fiduciaries failed to conduct a request

for proposal ("RFP") to evaluate whether the Plan's recordkeeping expenses were

reasonable.  (Ex. 2, Dyson, ¶ 61).  The Plan fiduciaries had not conducted an RFP

since 2014.  (Ex. 5, Charbonneau 96:5-8).  In fact, the 2014 RFP was conducted in

a flawed manner that resulted in a number of recordkeepers declining to bid citing

the "complexity of Magna's payroll and funding systems." (Ex. 3, Geist, ¶¶ 204-205; Ex. 15, Request for Proposal at 7869). As such, the Plan Fiduciaries, through Mercer, concluded the "lack of bids proves prohibitive to make an informed decision" to "determine whether Principal Financial Group is providing competitive services and competitive fees for services rendered." (Ex. 3, Geist, ¶ 205; Ex. 15, Request for Proposal at 7869). Despite the flawed process, the RFP did solicit a proposal from Fidelity that indicated Principal's recordkeeping fees were "excessive, unreasonable, and needed to be reduced." (Ex. 3, Geist, ¶ 204; Ex. 15, Request for Proposal at 7869). Yet, the Plan fiduciaries still selected Principal "to continue to provide record keeping services for the [Plan]" and failed to solicit bids from additional recordkeepers. (Ex. 3, Geist, ¶¶ 208, 211; Ex. 15, Request for Proposal at 7869).

Since 2014, no other formal RFPs have been conducted. Instead, the Plan's fiduciaries relied on information and documentation provided by representatives from Principal – the Plan's recordkeeper in receipt of these excessive fees – to confirm the Plan's fee structure. (Ex. 2, Dyson, ¶ 62; Ex. 3, Geist at ¶¶ 232-233, 316-328; Ex. 16, 1/20/17 Plan Fee Summary at 6161-6167). The Fee Summaries and disclosures provided by Principal failed to disclose all the components of the Plan's recordkeeping fees. (Ex. 3. Geist, ¶¶ 232-269; Ex. 16, 1/20/2017 Plan Fee Summary at 6161-6167; Ex. 17, 10/14/19 Plan Fee Summary at 6127; Ex 18, 10/3/12

8

Plan Fee Summary at 6191-6197; Ex. 19, 3/31/14 Investment Review at 3816-3823,

Ex. 20, 11/11/13 Plan Fee Summary at 6198-6211; Ex. 21, 9/20/15 Plan Fee

Summary at 6152-6190, Ex. 17, 10/14/19 Plan Fee Summary at 6123-6131, Ex. 12,

10/29/20 Plan Fee Summary at 7592-7601; Ex. 22, 12/17/15 Retirement Plan

Review at 11000 and 11005; Ex. 29, 4/8/14 email at 48711; Ex. 23, 11/11/14 Plan

Fee Summary at 6205-6211; Ex 24, 10/17/14 Retirement Plan Review at 2908; Ex.

25, Plan Expense Agreement at 6752-55; Ex. 26, Amendment 1 to Plan Expense

Agreement at 6974).

Comparing the pricing from other recordkeepers is/was necessary given the

fact that 76% of the Plan's current assets are held in Principal Proprietary

Investments. (Ex. 2, Dyson, ¶ 63). The Plan fiduciaries failed to consider Principal's

conflict of interest and the likelihood that they would not suggest a formal search for

a different recordkeeper to replace Principal as recordkeeper or, at the very least,

replace the Principal proprietary funds in the Plan. (Ex. 2, Dyson, ¶ 62). The Plan

fiduciaries testified to the use of Fiduciary Benchmarks as the primary method of

evaluating the Plan fees. (Ex. 2, Dyson, ¶ 63; Ex. 4, Wolkove Deposition 150:21-

23, 152:8-14; Ex. 5, Charbonneau Deposition 139:23-140:2). Each Fiduciary

Benchmark Report contains the following disclaimer: "The report is a tool to aid you

in evaluating your plan and should not be the sole source of information you use to

evaluate your plan." (Ex. 2, Dyson, ¶ 64; Ex. 11, 8/14/17 Email at 19646). Paul

Brock testified that Fiduciary Benchmarks was introduced to the Plan fiduciaries by Principal.  (Ex. 6, Brock 103:12-17).  The evidence shows the Committee agreed to utilize Fiduciary Benchmarks based on Principal's recommendation without regard for Principal's conflict of interest.  (Ex. 3, Geist, ¶¶ 270-287).

In May of 2021, CAPTRUST, after being retained by the Plan fiduciaries in February 2021 as a Plan advisor, conducted a request for information ("RFI") which demonstrated similar recordkeeping and administrative services were available from other similar, nationally recognized recordkeeping companies at a substantially lower cost ("CAPTRUST RFI").  (Ex 2, Dyson, ¶ 63; Ex 27, 5/2021 Vendor Fee Benchmark at 34720 and 34732-34733).  The 2021 RFI demonstrated that, contrary to the conclusions of the 2014 RFP, the Plan fiduciaries could have solicited bids from competitor recordkeepers even with the payroll complexity that existed in 2014.  (ex. 3, Geist, ¶¶ 211-214; Ex. 27 5/2021 Vendor Fee Benchmark at 34720-34737).  The CAPTRUST RFI further confirmed that the impact of the payroll complexity was at most $6 per participant and as little as $0 per participant which would require only a modest increase in the recordkeeping fees proposed by other recordkeepers.  (Ex. 3, Geist, ¶ 215; Ex. 27 5/2021 Vendor Fee Benchmark at 34732-34733).  Regardless, CAPTRUST's RFI was insufficient and structurally flawed. (Ex. 3, Geist, ¶¶ 288-315).

Even comparing the Plan's recordkeeping expenses to Principal with pricing from other recordkeepers assuming an equivalent amount of fund assets were invested in the proprietary products of those recordkeepers confirms that other similar, nationally recognized services providers could have provided recordkeeping services "with significant savings to the Plan and to the Plan participants." (Ex. 2, Dyson, ¶ 63). The potential savings could have been greater had the Plan fiduciaries conducted a formal RFP process as recordkeepers do not negotiate during an RFI process. (Ex. 2, Dyson, ¶ 63).

### iv.     Defendants Breached Their Duty of Loyalty to the Plan and its Participants

The evidence demonstrates Defendants were more interested in protecting the interests of Principal, the Plan's recordkeeper, than Plan participants. Defendants' decision to retain Principal even though both the 2014 RFP and the later CAPTRUST RFI confirmed that Principal consistently charged excessive recordkeeping fees than its peers for the same or almost the same services demonstrate Defendants improperly and disloyally were "influenced by considerations outside the scope of the exclusive benefit of Plan Participants." (Ex. 3, Geist, ¶ 222). As addressed *supra,* the fact that 76% of the Plan's current assets are beheld in Principal Proprietary Investments that subject Plan participants to excessive and inequitably applied revenue sharing fees further confirms Defendants failed to protect participants' interests. Defendants also relied on Fiduciary

Benchmarks, a service recommended by Principal, without regard for Principal's conflict of interest. Similarly, Defendants' decision to subject the Plan's participants to unnecessarily high recordkeeping fees for ease of addressing the Plan sponsor's payroll inefficiencies prioritizes easing Defendants' administrative concerns over benefitting the Plan participants. (Ex. 3, Geist, ¶¶ 224-226). Defendants also failed to utilize its broad relationship with Principal as its recordkeeper to secure further discounts. (Ex. 3, Geist, ¶¶ 329-337).

### v. Defendants Failed to Document A Prudent Process in the Meeting Minutes

The Plan fiduciaries testified that committee meetings lasted between sixty and ninety minutes and all major decisions were documented in the meeting minutes. (Ex. 2, Dyson, ¶ 78; Ex. 4, Wolkove 55:13-24; Ex. 6, Brock 69:11-21; Ex. 5, Charbonneau 64:20-65:3). The Plan fiduciaries also testified no other records documenting major decisions regarding the Plan were archived or recorded. (Ex. 2, Dyson, ¶ 78-79; Ex. 5, Charbonneau 65:10-16). Yet, the meeting minutes reveal a very different reality. The meeting minutes demonstrate a lack of sufficient discussion regarding the process or evaluation of Plan fees or investment options. (Ex. 2, Dyson Report, ¶¶ 78-79). Specifically, the meeting minutes lack documentation regarding review of the Plan investments in relation to the Plan IPS and review of Target Date Funds in accordance with U.S. Department of Labor guidance. (Ex. 2, Dyson, ¶ 79).

12

## II.    LEGAL STANDARD

### A. Summary Judgment Standard

Rule 56 allows summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).   The burden of demonstrating the absence of a genuine issue of material fact rests on the party moving for summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish …the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof."  *Isom v. Ramsey*, 2009 WL 3172100, at *1 (W.D. Ky. Sept. 29, 2009) (citing *Celotex Corp.*, 477 U.S. at 323).

### B. ERISA's Prudence Standard

A fiduciary must act for the exclusive purposes of (1) "providing benefits to participants and their beneficiaries;" and (2) "defraying reasonable expenses."  29 U.S.C. § 1104(a)(1).   Reasonableness requires "the care, skill, prudence, and diligence" of a person "'acting in a like capacity and familiar with such matters.'"  *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (quoting 29 U.S.C. § 1104(a)(1)).

ERISA breach of fiduciary duty claims are "ill-suited for summary judgment."  *Cates v. Trs. of Columbia Univ. in City of New York*, No. 1:16-cv-06524 (GBD)

(SDA), 2019 WL 8955333, at *5 (S.D.N.Y. Oct. 25, 2019), *R. & R. adopted*, 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020). This is because "[t]he fiduciary standard imposed by ERISA requires the application of a reasonableness standard." *Board of Trs. of S. California IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, No. 09 Civ. 6273 (RMB), 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011) ("Rarely will such a determination be appropriate on a motion for summary judgment."); *accord Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("A fiduciary's obligations are a fact intensive inquiry which typically cannot be resolved on summary judgment."); *see also Pension Fund-Mid Jersey Trucking Industry-Local 701 v. Omni Funding Group*, 731 F. Supp. 161, 169 (D.N.J. 1990).

Indeed, "[i]t is a question for a fact finder to decide whether [an action] is prudent in the context of all of the defendants' actions." *See Cryer v. Franklin Resources, Inc.*, No. 16-cv- 04265-CW, 2018 WL 6267856, at *9 (N.D. Cal. Nov. 16, 2018) (citation omitted). Although the record clearly demonstrates that Defendants acted imprudently and disloyally, the Court does not need to find that Plaintiffs are likely to succeed on their claims at this juncture. *See Feinberg v. T. Rowe Price Group, Inc.*, No. JKB-17-427, 2021 WL 488631, at *2 (D. Md. Feb. 10, 2021) ("Though the Court is skeptical of certain of Plaintiffs' arguments regarding alleged breaches of fiduciary duties, Plaintiffs have largely identified sufficient evidence to allow their claims to proceed to trial."); *see also Reetz v. Lowe's Cos.,*

*Inc.*, No. 5:18-CV-000075-KDB-DCK, 2021 WL 535160, at *2 (W.D.N.C. Feb. 12, 2021) ("Who has the better evidence? Where does the truth lay? These questions cannot and should not be determined on cross-motions for summary judgment. Instead, the answers must be found at trial….").

### III.   ARGUMENT

#### A. Defendants Failed to Prudently and Loyally Monitor the Plan's Investments and Recordkeeping Fees

It is of no moment that Defendants' process checked certain boxes, because it lacked the core characteristics of a *sufficient* process. Indeed, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not . . . suffice in every case to demonstrate prudence." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021).  This is because "[d]eliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever."  *Id.* (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Medical Center*, 712 F.3d 705, 720 (2d Cir. 2013) (emphasis in original).  In asking the Court to find otherwise, Defendants invite the Court to simply look past inconvenient facts and improperly weigh expert testimony.

That Defendants retained the challenged investments despite the ready availability of other less costly investment alternatives is sufficient to "establish[] disputed questions of material fact on whether the defendants breached their fiduciary duties of prudence and loyalty in maintaining" the funds in the Plan.  *Sims v. BB&T Corp.*, 2018 WL 3128996, at *8 (M.D.N.C. June 26, 2018).  Defendants hope their use and discussion of watch-lists at several Committee meetings suffices, Defs. Mem. at 6-7, 15, but merely discussing a subject at a meeting does not establish that fiduciaries adequately weighed the costs and benefits of a challenged investment.  *See Cryer v. Franklin Resources, Inc.*, 2018 WL 6267856, at *9 (N.D. Cal. Nov. 16, 2018) (citing *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 795 (7th Cir. 2011)).  Even assuming *arguendo* the Committee's use of watch lists is indicative of prudence (by itself, it is not), isolated instances of prudence do not excuse other imprudence.  *See Feinberg v. T. Rowe Price Group, Inc.*, 2021 WL 488631, at *8 (D. Md. Feb. 10, 2021) ("[T]hough the evidence shows the Trustees engaged in a legitimate oversight process and that the Plan's assets tripled under their stewardship, it would be premature to find that their conduct was loyal and prudent in all instances as a matter of law.").

### 1. There is Ample Evidence Defendants Failed to Select the Identical Lower-Cost Share Class in Violation of ERISA

Plaintiffs' primary claim is that Defendants failed to offer available identical lower-cost alternatives to the Plan's investments.  To meet their fiduciary duties,

fiduciaries are "obligated to minimize costs." *Tibble v. Edison, Int., et al* 843 F.3d 1187, 1198 (9th Cir. Dec 30, 2016) (citing Unif. Prudent Investor Act § 7). Indeed, "[c]ost-conscious management is fundamental to prudence in the investment function." *Id.* at 1197-98 (quoting Restatement (Third) of Trusts § 90 cmt. b (2007)). "Beneficiaries subject to higher fees… lose not only the money spent on higher fees, but also 'lost investment opportunity;' that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198. Accordingly, "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical – other than their lower cost – to products the trustee has already selected." *Id.* Fiduciaries breach their duty when "a superior alternative investment was readily apparent such that an adequate investigation would have uncovered that alternative." *Leber v. Citigroup 401(k) Inv. Comm.*, 129 F.Supp.3d 4, at 14 (S.D.N.Y. 2015).

There is, at least, a genuine dispute over the "thoroughness of [Defendants'] investigation into the merits of" the challenged investments. *Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 474 (4th Cir. 2020) (internal quotation omitted). Defendants wrongly suggest none of Plaintiffs' experts opine that the Plan's investment options were imprudent. Defs. Mem.at 14. On the contrary, Mr. Dyson details several reasons why the Plan's TDF suite is/was imprudent, including that the TDFs paid

for a "disproportionately large proportion of revenue share."  (Ex. 2, Dyson, ¶ 15).

*See also supra* Section II.B.i; *see also Ramos v. Banner Health*, 2019 WL 1777524,

at *10 (D. Colo. Apr. 23, 2019) (expert testimony on replacement of challenged

funds defeats summary judgment).

Defendants hang their hat on the argument that "revenue sharing is a common

and permissible way to pay recordkeeping fees."  Defs. Mem. at 18.  But the mere

fact that revenue sharing is "common" or "permissible" does not mean it was prudent

here.  "[T]he question is not 'whether a revenue-sharing model is within the range

of reasonable choices a fiduciary might make', but whether this revenue sharing

arrangement was reasonable under all the circumstances."  *Troudt v. Oracle Corp*.,

2017 WL 1100876, at * 2 (D. Col. Mar. 22, 2017).  The fact that the TDFs (and the

participants invested in them) foot the bill for over 72% of the Plan's revenue share

when only about 40% of the Plan's investment assets were invested in the TDFs

suggests otherwise.  (Ex. 2, Dyson, ¶ 15).  The Plan sustained an estimated $1.8 to

$12.8 million in damages due to the selecting of the higher cost share class of the

TDFs.  (Ex. 1, Jones, ¶ 24).  Ultimately, in 2020, revenue share was eliminated from

the Plan and replaced with an asset-based fee of 0.06%.  (Ex. 2, Dyson, ¶ 53, Ex. 12,

10/29/20 Plan Fee Summary at 7592).  Even Mr. Charbonneau conceded that the

switch away from revenue share "takes away some layers of complexity;" made

expenses "a little more transparent" and "more equitable."  (Ex. 2, Dyson, ¶ 57; Ex.

5, Charbonneau 149:16-23).  The record contains "more than enough evidence to create disputed issues of fact as to whether Defendants discussed or even understood the difference of certain types of fee arrangements . . . and whether Defendants acted prudently regarding the fees paid by the Plan."  *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 387214, at *8 (S.D. Ind. Jan. 30, 2019).

### 2.  The Evidence Demonstrates Defendants Failed to Implement a Prudent Process for Monitoring Recordkeeping Fees

Ignoring compelling evidence of its lack of a prudent process, Defendants argue they met their fiduciary duties and that the recordkeeping fees paid to Principal were reasonable.  Defs. Mem. at 20-23.  "Wasting beneficiaries' money is imprudent [and] . . . trustees are obliged to minimize costs." *Tibble*, 843 F.3d at 1197 (quoting Unif. Prudent Investor Act § 7).  This includes a duty to use "the power the trust wields" to obtain more favorable fees. *Id.* at 1198. As such, a fiduciary breaches its duty if it fails to "diligently investigate" and "monitor" recordkeeping costs. *Tussey*, 746 F.3d at 336 (8th Cir. 2014).   *Tussey* upheld a district court's ruling that a fiduciary breached its duties by failing to:

> (1) calculate the amount the Plan was paying Fidelity for recordkeeping through revenue sharing, (2) determine whether Fidelity's pricing was competitive, (3) adequately leverage the Plan's size to reduce fees, and (4) 'make a good faith effort to prevent the subsidization of administration costs of ABB corporate services' with Plan assets. . .

*Id.*

The undisputed evidence demonstrates that the Defendants failed to implement a prudent process to monitor the Plan's recordkeeping costs and failed to wield the power of the Plan to obtain more favorable fees.   Defendants pat themselves on the back for obtaining "a reduction of its Core Fee from 13 to 10 basis points" and retaining Mercer to conduct a RFP prior to the start of the Class Period. Defs. Mem. 20-21.   But the fact of a fee reduction alone is not proof of a prudent process, particularly absent any determination that the new fee is reasonable. *See Creamer v. Starwood Hotels & Resorts Worldwide, Inc.*, 2017 WL 2992739, at *3 (C.D. Cal. May 11, 2017) (there is a "breach of [the] duty [of prudence] where a fiduciary fails to ensure a pension plan's fees are reasonable") (citing *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)); *see also Liss v. Smith*, 991 F. Supp. 278, 300 (S.D.N.Y. 1998) ("Trustees also have an ongoing obligation to monitor the fees charged and services provided by service providers with whom a fund has an agreement, to ensure that renewal of such agreements is in the best interest of the fund"). "That the fees were lowered by some amount during the relevant period does not establish as a matter of law that [Defendants] discharged [their] duty of prudence or that [they] reasonably might have, and should have, obtained the same services at lower cost." *Terraza v. Safeway Inc.*, 2019 WL 1589979, at *2 (N.D. Cal. Mar. 6, 2019). Defendants point to no authority suggesting otherwise.

After a flawed RFP process, see *supra* Section II.B.iii, beginning on January 1, 2014, Defendants selected Principal as the Plan's recordkeeper and, in the years following, predominantly relied only on information provided by Principal, including Fiduciary Benchmarks –recommended to Defendants by Principal – to "monitor" the Plan's fees.  *See supra* Section II.B.iii.; *see also* Defs. Mem. at 21 ("the Committee continued to monitor recordkeeping fees through presentations from Principal").  Since 2014, no other formal RFPs have been conducted.  (Ex. 2, Dyson, ¶ 61; Ex. 5, Charbonneau 96:5-8).  Defendants' "hands-off" approach is inconsistent with their "ongoing obligation to monitor the fees charged and services provided by service providers . . . to ensure that renewal of such agreements is in the best interest" of the Plan and its participants and beneficiaries.  *Liss*, 991 F. Supp. at 300 (citing *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1088 (7th Cir. 1992)).

Courts have recognized that a failure to conduct competitive bidding precludes summary judgment on claims that fiduciary defendants caused a plan to pay excessive fees.  In *Cunningham v. Cornell Univ.*, the Court concluded, "while competitive bidding is not required under ERISA, summary judgment has been denied where fiduciaries failed to solicit competitive bidding . . ." *See Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *6 (S.D.N.Y. Sept. 27, 2019) (citing *George*, 641 F.3d at 800 (denying summary judgment where defendants admitted they never

issued a request for proposal or request for information concerning the plan's recordkeeping arrangement)); *see also Cates v. Trustees of Columbia Univ. in City of New York*, 2019 WL 8955333, at *5 (S.D.N.Y. Oct. 25, 2019) ("Competitive bidding can be an example of an action taken to ensure fees are appropriate."). Defendants fail to adequately explain how they could have ensured the Plan paid only reasonable fees in the absence of competitive bidding during the Class Period.

Defendants attack Geist's criticisms of the Committee's process for monitoring the recordkeeping fees and conducting the 2014 RFP and 2021 RFI, Defs. Mem. at 21-23, but courts routinely deny summary judgment when the parties' experts disagree. *See, e.g., George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 798 (7th Cir. 2011) (reversing summary judgment and holding an expert's opinion that 401(k) recordkeeping fees were unreasonable created genuine issues of material fact); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 52 (2d Cir. 2007) ("courts also must be wary of granting summary judgment when conflicting expert reports are presented"); *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Trust I 2007-1 v. Morgan Stanley Mortgage Capital Holdings, LLC*, 289 F.Supp.3d 484, 513 (S.D.N.Y. 2018) ("The Court is persuaded that plaintiff's expert reports are wholly sufficient to create a genuine dispute as to the materiality of defendant's alleged breaches."). Regardless, it is improper to weigh the credibility of the Parties' experts at this stage. *Moreno v. Deutsche Bank of Americas Holding Corp.*,

22

2018 WL 2727880, at *3 (S.D.N.Y. June 6, 2018) ("No such determination is appropriate at the summary judgment stage."); *see also Baird v. Blackrock Inst. Tr. Co., N.A.*, 2021 WL 105619, at *3 (N.D. Cal. Jan. 12, 2021) ("Defendants' loss causation arguments . . . also involve weighing the credibility of the parties' respective experts and their methodologies, a task which is inappropriate at the summary judgment stage.").

Since Defendants failed to even consider competitive benchmarking in order to determine reasonable rates for the recordkeeping and administrative services obtained by the Plan and Plaintiffs' experts provides a reliable, alternative means to do so, Defendants cannot possibly establish an entitlement to summary judgment.

### 3. Defendants Breached Their Duty of Loyalty to the Plan's Participants

The duty of loyalty is breached when "a fiduciary acted for the purpose of providing benefits to itself or some third party." *Cassell v. Vanderbilt Univ.*, 285 F.Supp.3d 1056, 1061-62 (M.D. Tenn. 2018). Defendants need not set out to enrich themselves in order to violate ERISA's duty of loyalty; benefiting a third party over the Plan participants is also a violation. *See, e.g., Johnson v. Providence Health & Serv.*, 2018 WL 1427421, at * 9 (W.D. Wash. March 22, 2018). In light of the evidence that Defendants made decisions that benefited Principal over the Plan's participants and out of convenience to the Plan's fiduciaries at the expense of participants, *see supra* Section II.B.iv., contrary to Defendants' bare assertions, their

conduct was inconsistent with the exclusive purpose of benefitting plan participants and forecloses summary judgment on Plaintiffs' disloyalty claims.

### 4. Plaintiffs' Claim for Breach of Defendants' Duty to Monitor Should Proceed to Trial

As addressed *supra*, the evidence demonstrates numerous breaches of the fiduciary duties of prudence and loyalty on the part of Defendants.  Thus, Plaintiffs will be able to prove at trial that Magna, if not  the Board, failed to adequately monitor the Committee.

### 5. Defendants' Resort to the Advice of Non-Fiduciaries Fails

The duty to *independently* investigate the merits of a particular investment has been described as "the most basic of ERISA's investment fiduciary duties." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).  In carrying out this duty, fiduciaries may not simply and "passively accept[]" proposals made by an advisor or consultant, however competent or qualified. *Unisys*, 74 F.3d at 436. Flatly, fiduciaries' "belie[f]" in the quality of research conducted by an advisor or consultant is not enough. *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

Against this backdrop, Defendants' implications that their reliance on Fiduciary Benchmarks, Principal, Wilshire, and/or CAPTRUST somehow fulfills any conceivable process gaps is completely unfounded.  None of Defendants'

arguments excuse the abject lack of knowledge and understanding of fundamental concepts of Defendants' fiduciary duties demonstrated by members of the Committee.  These deficiencies left some members of the Committee completely unable to act in an informed manner, consistent with their fiduciary duties, let alone reach independent determinations concerning the reasonableness of the advice they received from their advisors, particularly Principal who served as both an advisor and recordkeeper to the Plan during the Class Period despite the conflict of interest. *See Unisys*, 74 F.3d at 436.

As addressed *supra* Section II.A, Defendants selected and retained Principal as the Plan's recordkeeper. Tellingly, the evidence shows Defendants selected and retained funds in the Plan that were proprietary to Principal and relied on information provided by Principal, including Fiduciary Benchmarks, to evaluate the Plan's fees. Defendants ignore genuine factual disputes about reasonableness of their reliance on Principal, as well as the other advisors.  At bottom, this is a case in point of the recognition that independent appraisal "is a tool and, like all tools, is useful only if used properly."  *Donovan v. Mazzola*, 716 F.2d 1226, 1474 (9th Cir. 1983).

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment.

Dated: April 14, 2022                           Respectfully submitted,

**CAPOZZI ADLER, P.C.**

*/S/ Mark K. Gyandoh*
Mark K. Gyandoh
(*admitted pro hac vice*)
Gabrielle Kelerchian
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com
gabriellek@capozziadler.com


**CAPOZZI ADLER, P.C.**
Donald R. Reavey
(*admitted pro hac vice*)
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2022, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.


By: *<u>/s/Mark K. Gyandoh</u>*

Mark K. Gyandoh, Esq.