# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| MELVIN DAVIS and DAKOTA KING, individually and on behalf of all others similarly situated, | ) ) ) | Case No. 2:20-cv-11060-NGE-RSW |
| | ) | |
| Plaintiffs, | ) | Hon. Nancy G. Edmunds |
| | ) | |
| v. | ) | Magistrate R. Steven Whalen |
| | ) | |
| MAGNA INTERNATIONAL OF AMERICA, INC., et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS' OPPOSITION TO
# PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## **TABLE OF CONTENTS**

ISSUES PRESENTED....................................................................................iv

CONTROLLING AND/OR MOST APPROPRIATE AUTHORITIES.................v

INTRODUCTION .........................................................................................1

BACKGROUND ...........................................................................................2

LEGAL STANDARD....................................................................................5

ARGUMENT ...............................................................................................6

    I.      Plaintiffs are convicted criminals with a history of dishonesty. ...........7

    II.     Plaintiffs are indifferent and unknowledgeable about the class's claims.................................................................................................9

         A.     Davis has failed to monitor the case and lacks knowledge of the class's claims. .............................................................10

         B.     King also lacks knowledge of the claims and has failed to monitor counsel...........................................................13

    III.    Plaintiffs' claims present intra-class conflicts, and their interests are not aligned with those of other class members. ...........................14

         A.     Plaintiffs' theories of fiduciary breach create intra-class conflicts that foreclose class certification.................................16

              1.     Plaintiffs' revenue sharing theory creates an intra-class conflict. ...................................................17

              2.     Plaintiffs' proposed alternative to the Invesco Oppenheimer Developing Markets Y fund creates an intra-class conflict....................................................21

         B.     Plaintiffs lack the incentive to prosecute all of the claims of unnamed class members. ......................................................23

CONCLUSION............................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*In re AEP ERISA Litig.*,
   2008 WL 4210352 (S.D. Ohio Sept. 8, 2008) ..............................................10, 12

*In re Am. Med. Sys., Inc.*,
   75 F.3d 1069 (6th Cir. 1996) .....................................................6, 24, 25

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)...................................................................15, 16

*Bell v. Pension Comm. of ATH Holding Co.*,
   2018 WL 4385025 (S.D. Ind. Sept. 14, 2018)......................................14, 17, 21

*Davis v. City of Detroit*,
   2018 WL 4784661 (E.D. Mich. May 11, 2018) ...................................19

*In re Diebold ERISA Litig.*,
   2009 WL 9120614 (N.D. Ohio Mar. 11, 2009)...........................................16, 23

*Gooch v. Life Inv'rs Ins. Co. of Am.*,
   672 F.3d 402 (6th Cir. 2012) ...................................................7

*Jamison v. First Credit Servs., Inc.*,
   290 F.R.D. 92 (N.D. Ill. 2013)................................................7

*Langbecker v. Elec. Data Sys.*,
   476 F.3d 299 (5th Cir. 2007) ....................................................16, 23

*Pope v. Harvard Bancshares, Inc.*,
   240 F.R.D. 383 (N.D. Ill. 2006)........................................................8, 9

*Prudhomme v. Gov't Emps. Ins. Co.*,
   2022 WL 510171 (5th Cir. Feb. 21, 2022) .......................................18

*S & M Homes, LLC v. Chicago Title Ins. Co.*,
   2014 WL 12634492 (W.D. Tenn. Mar. 14, 2014).............................................10

*Schleicher v. Wendt*,
   2009 WL 761157 (S.D. Ind. Mar. 20, 2009) .....................................7

*Shi v. Sina Corp.*,
  2005 WL 1561438 (S.D.N.Y. July 1, 2005) ........................................................8

*Smith v. Babcock*,
  19 F.3d 257 (6th Cir. 1994) ..................................................................16

*Spano v. Boeing Co.*,
  633 F.3d 574 (7th Cir. 2011) ................................................................17

*Sprague v. General Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998) .................................................................6

*Stanich v. Travelers Indem. Co.*,
  259 F.R.D. 294 (N.D. Ohio 2009) ............................................................7

*Tibble v. Edison Int'l*,
  575 U.S. 523 (2015) ........................................................................24

*United States v. Peatross*,
  377 F. App'x 477 (6th Cir. 2010) ............................................................8

*Vassalle v. Midland Funding LLC*,
  708 F.3d 747 (6th Cir. 2013) ...............................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .........................................................................5

*Yost v. First Horizon Nat'l Corp.*,
  2011 WL 2182262 (W.D. Tenn. June 3, 2011) ................................................16

**Statutes & Rules**

18 U.S.C. § 1343 ................................................................................8

Fed. R. Civ. P. 23 .........................................................................*passim*

Fed. R. Evid. 609 ................................................................................8

## **<u>ISSUES PRESENTED</u>**

1.      Whether the adequacy requirement is met where the named plaintiffs are convicted criminals with a history of dishonesty.

2.      Whether the adequacy requirement is met where the named plaintiffs are indifferent and unknowledgeable about the claims of the proposed class.

3.      Whether the adequacy and typicality requirements are met where the named plaintiffs' incentives do not align with the interests of the proposed class in light of (a) intra-class conflicts created by their theories of liability, and (b) their decision to invest in only one of the multiple investment options they have challenged in this suit.

## <u>CONTROLLING AND/OR MOST APPROPRIATE AUTHORITIES</u>

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)

*Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012)

*In re Am. Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996)

*In re AEP ERISA Litig.*, 2008 WL 4210352 (S.D. Ohio Sept. 8, 2008)

## **INTRODUCTION**

This is one of dozens of similar class actions brought by the same plaintiffs' counsel—a firm that recruits people to serve as plaintiffs in putative class actions attacking the management of 401(k) plans. In many such cases, a class has been certified. But this case is unique. The two Plaintiffs are convicted criminals with a history of dishonesty. One of them committed fraud, and the other dissembled at his deposition about the same conduct that led to his convictions. And neither Plaintiff has even rudimentary knowledge about his claims or has tried to monitor the case. Taken together, these facts show that Plaintiffs cannot meet the adequacy requirement of Rule 23(a)(4). For this reason alone, class certification should be denied.

But there is a second and independent reason to deny class certification: Plaintiffs' legal theories pose intra-class conflicts that pit one group of participants against another. Plaintiffs are pursuing claims on two subjects: the Plan's recordkeeping fees and its investment options. On the recordkeeping claim, Plaintiffs attack the Plan's use of revenue sharing to pay recordkeeping fees, and their expert claims it was "inequitable" to use revenue sharing the way it was used here because some participants effectively paid more than others. But if this is true, it means that some class members *benefited* from the very same practice Plaintiffs now challenge, thereby creating a classic intra-class conflict. Even if the Court

1

could overlook the conflict, Plaintiffs have proposed no way to identify which participants were allegedly harmed, which means the class members are not sufficiently ascertainable either.

On the investment claims, the conflict is equally stark. Plaintiffs attack the fees of certain investment options and claim they should have been replaced with "lower-fee alternatives." But the Plan's investments often outperformed Plaintiffs' proposed alternatives. That means some members of the proposed class would have been worse off if the alternatives Plaintiffs now tout had been adopted, leaving them with no damages (or even negative damages) under Plaintiffs' theory of the case. Here again, Plaintiffs have proposed no way to separate participants with no damages from those who, under Plaintiffs' theory, suffered economic harm.

In short, Plaintiffs cannot meet their burden of showing they would adequately represent the proposed class—and even if they could, the class they seek to represent is riven with intra-class conflicts. Plaintiffs' motion for class certification should be denied.

## **BACKGROUND**

**The Claims.** Plaintiffs are participants in the Magna Group of Companies Retirement Savings Plans (the "Plan"). ECF No. 30, PageID.370-371. They allege that Defendants breached their ERISA fiduciary duties by (i) failing to replace

certain Plan investment options with lower-fee alternatives, and (ii) allowing plan participants to pay excessive recordkeeping fees. ECF No. 44, PageID.527-528, PageID.532-533; *see also* ECF No. 45, PageID.549-551 ¶¶ 9-12.

**Plaintiffs.** The complaint was filed by four individuals: Melvin Davis, Dakota King, Shawnetta Jordan, and Wayne Anderson. ECF No. 1, PageID.1. Jordan and Anderson withdrew from the case during discovery. ECF No. 37, PageID.480. Only King and Davis continued as plaintiffs.

The remaining Plaintiffs have two things in common: They are both former employees of Magna, ECF No. 30, PageID.370-371, and they are both convicted criminals. Davis pled guilty to a felony charge of conspiracy to commit wire fraud in 2011. *See* Exs. 9-10, *United States v. Davis*, 2:11-cr-20420 (E.D. Mich.) Dkts. 9, 12; *see also* Ex. 1, Davis Dep. 11:21-12:1, 13:7-25. King has been convicted on several criminal charges, including for driving under the influence and for disorderly conduct due to alcohol intoxication. *See* Ex. 2, King Dep. 115:10-118:23. He was fired from Magna for violating its Drug and Alcohol Testing Policy because he refused a drug test when he was suspected of drinking on the job, *see* Ex. 8, King Personnel File at 7936-37[1]—but when asked point-blank at his deposition whether he resigned or was terminated, he falsely testified, "I left. I quit." Ex. 2, King Dep. 114:3-7.

---

[1] Citations to Bates-stamped exhibits use the ending digits of the Bates numbers.

**The Plan's Investment Options.** The Plan offered participants approximately 15 investment options, *see* Ex. 5, Case Rpt. ¶ 13 & Case Ex. 2, and Plaintiffs claim that five of those investment options were imprudent: (i) the Principal LifeTime Hybrid target date fund suite (the "Principal TDFs"), (ii) the Principal US Property Separate Account, (iii) the Principal Core Plus Bond Separate Account, (iv) the Principal International Equity Index Separate Account, and (v) the Invesco Oppenheimer Developing Markets fund. *See* Ex. 7, Jones Rpt. ¶ 11. Both Plaintiffs invested their entire account balances in the Principal TDFs for the duration of their participation in the Plan; they did not invest in the other four challenged options. *See* ECF No. 45-4, PageID.582 ¶ 5; ECF No. 45-5, PageID.586 ¶ 5.

**Recordkeeping Expenses.** Principal Life Insurance Company, a subsidiary of Principal Financial Group ("Principal"), was the Plan's recordkeeper during the class period. *See* Ex. 12, Principal Agreement. For most of this time, Principal was paid through revenue sharing. *See, e.g.*, Exs. 17-19, Fee Disclosures. Under a revenue sharing arrangement, a portion of an investment option's expense ratio (the percentage of assets in the fund allocated to expenses) is paid to the recordkeeper instead of the investment manager. *See* ECF No. 30, PageID.409 ¶ 111; Ex. 5, Case Rpt. ¶ 81. Some of the Plan's investment options paid revenue sharing and some did not. *See* Ex. 5, Case Rpt. ¶ 99. During the class period,

401(k) plans commonly used revenue sharing, and revenue sharing payments were typically drawn from a few plan investment options rather than all of them. *Id.* ¶¶ 81-82, 99. The investment options in the Plan's lineup that paid the most revenue sharing were the Principal TDFs. *Id.* ¶ 99.

## LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). "[T]o justify a departure from that rule," a plaintiff "must affirmatively demonstrate his compliance with" the requirements of Fed. R. Civ. P. 23. *Id.* at 348, 350. "Rule 23 does not set forth a mere pleading standard," so courts do not accept a complaint's allegations as true, and instead require plaintiffs to "be prepared to prove" their compliance. *Id.* at 350.

Under Rule 23(a), Plaintiffs must demonstrate numerosity, commonality, typicality, and adequacy. Plaintiffs can meet the adequacy requirement only if the Court is persuaded, "after a rigorous analysis," that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); *Dukes*, 564 U.S. at 350-51. The Sixth Circuit uses a two-part test to determine adequacy: (1) the named representatives "must have common interests with unnamed members of the class," and (2) the representatives must show that they

5

"will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (quoting *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).

The typicality requirement "limit[s] the class claims to those fairly encompassed by the named plaintiffs' claims." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (quoting *Am. Med. Sys.*, 75 F.3d at 1082)). The typicality and adequacy requirements overlap "because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Am. Med. Sys.*, 75 F.3d at 1083.

## **ARGUMENT**

Plaintiffs fail to satisfy the adequacy and typicality requirements of Rule 23 for three reasons.[2] First, Plaintiffs are inadequate class representatives because they are convicted criminals with a demonstrated history of dishonesty. Second, they are inadequate because they have demonstrated indifference toward and a lack of even the most basic understanding of the class's claims. Third, their legal theories create irreconcilable intra-class conflicts that pit one group of Plan participants against another. Each of these points is explained below.

---

[2] Defendants do not dispute that Plaintiffs have satisfied the numerosity and commonality requirements.

## I.     Plaintiffs are convicted criminals with a history of dishonesty.

Plaintiffs are convicted criminals with a demonstrated history of dishonesty—serious issues that surfaced during discovery, but that their opening brief fails to disclose, much less explain away. That history forecloses their ability to serve as trustworthy class representatives—a fiduciary position that these plaintiffs are ill-suited to fill.

To determine whether a class representative can adequately fulfill his responsibilities, "courts may consider [his] honesty and trustworthiness." *Gooch v. Life Investors Ins. Co.*, 672 F.3d 402, 431 (6th Cir. 2012). "The honesty and credibility of a class representative is relevant" to adequacy because "an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims." *Stanich v. Travelers Indem. Co.*, 259 F.R.D. 294, 310 (N.D. Ohio 2009). Similarly, evidence of a prior conviction may cause a fact finder to concentrate on issues of credibility at the expense of the class's claims. *See Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 105 (N.D. Ill. 2013). Numerous courts have held that a criminal conviction involving dishonesty disqualifies a plaintiff from serving as a class representative. *See, e.g.*, *id.* at 104-05 (fraud conviction was "sufficient by itself" to make class representative inadequate); *Schleicher v. Wendt*, 2009 WL 761157, at *3 (S.D. Ind. Mar. 20, 2009) (ten-year-old, expunged fraud conviction rendered class representative inadequate), *aff'd*, 618 F.3d 679 (7th Cir. 2010);

*Pope v. Harvard Bancshares, Inc.*, 240 F.R.D. 383 (N.D. Ill. 2006) (tax fraud

convictions rendered class representative inadequate); *Shi v. Sina Corp.*, 2005 WL

1561438, at *4-5 (S.D.N.Y. July 1, 2005) (lead plaintiff group was inadequate

because it included a member convicted of a crime of dishonesty ten years earlier).

Davis pleaded guilty to conspiracy to commit wire fraud in violation of 18

U.S.C. § 1343 in 2011; he was sentenced to a term of supervised release that ended

in 2013. *See* Exs. 9-11, *United States v. Davis*, 2:11-cr-20420 (E.D. Mich.) Dkts. 9,

12-13; *see also* Ex. 1, Davis Dep. 11:21-12:1, 13:7-25. Davis admitted that he

conspired to create fictitious appliance repair and exchange reports, causing new

appliances to be delivered to co-conspirators and others not entitled to receive

them. Ex. 9, *United States v. Davis*, 2:11-cr-20420 (E.D. Mich.) Dkt. 9 ¶ 3. This is

a textbook example of a crime of dishonesty that disqualifies Davis from serving as

a class representative. His conviction is admissible[3] and would likely overshadow

the class's claims. The interests of the class would be significantly jeopardized by

---

[3] Evidence of his conviction is admissible under Fed. R. Evid. 609(a), notwithstanding the ten-year exception in Fed. R. Evid. 609(b). Rule 609(b) does not apply because Davis finished his period of supervised release in 2013, less than 10 years ago. Ex. 11, *United States v. Davis*, 2:11-cr-20420 (E.D. Mich.) Dkt. 13; *see also United States v. Peatross*, 377 F. App'x 477, 489 (6th Cir. 2010) (ten-year period begins after the end of confinement or when the "period of his parole or probation has expired"). Second, given Davis's proposed role as class representative, evidence about his credibility is probative, and Plaintiffs have fair notice and opportunity to contest the use of that evidence. *See* Fed. R. Evid. 609(b)(1), (2).

these credibility issues. As a result, Davis is an inadequate class representative.

King's criminal history, together with his misleading deposition testimony, shows that he too is untrustworthy. He has multiple convictions, including for driving under the influence and for disorderly conduct due to alcohol intoxication. *See* Ex. 2, King Dep. 115:13-118:23. Magna fired him from his job as a forklift operator for violating Magna's Drug and Alcohol Testing Policy after he was suspected of drinking on the job and refused a drug test. Ex. 8, King Personnel File at 7936-37. To make matters worse, at his deposition he falsely stated that that he had "quit" rather than being fired. Ex. 2, King Dep. 114:3-7. This combination of law-breaking and false testimony makes King an inadequate class representative. He should not be entrusted with shepherding the claims of tens of thousands of current and former Magna employees. *See Pope*, 240 F.R.D. at 390 (plaintiff who "made up a false story to cover up [his] wrongdoing" was "not the best choice for a [representative] who must honestly look out for the best interests of absent class members"). Because no class can be certified without a class representative who can be trusted to serve as a fiduciary and who passes Rule 23(a)(4)'s "adequacy" test, Plaintiffs' motion for class certification should be denied.

## II.   Plaintiffs are indifferent and unknowledgeable about the class's claims.

Plaintiffs' shortcomings as proposed fiduciaries to the class do not end with the issues discussed above. To satisfy adequacy, class representatives must also

"demonstrate a basic understanding of the facts and legal claims comprising their case." *In re AEP ERISA Litig.*, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008). A plaintiff who "demonstrates so little knowledge of and involvement in the case that [he] is unable to protect class interests" is inadequate. *Id.* Class representatives must also show that they are "not merely a pawn of the class lawyers" and are willing and able to monitor class counsel and act in the class's best interests. *Id.* Plaintiffs who are indifferent to or disengaged from the lawsuit do not meet these requirements. *See, e.g.*, *S & M Homes, LLC v. Chicago Title Ins. Co.*, 2014 WL 12634492, at *11 (W.D. Tenn. Mar. 14, 2014) (plaintiff who showed "some indifference as a class representative" was inadequate).

Davis and King fall far short of these requirements. They have each demonstrated indifference toward the class's claims, an inability to monitor class counsel, and a lack of knowledge about even the most basic aspects of the case. These deficiencies—particularly when considered alongside the issues discussed above—disqualify them from controlling the claims of the more than 20,000 proposed class members they seek to represent.

### A.   Davis has failed to monitor the case and lacks knowledge of the class's claims.

Davis admitted that he had never read the entire complaint before his deposition in September 2021—approximately 17 months after this case was filed. Ex. 1, Davis Dep. 74:17-75:19. He also had seen the Court's order on Defendants'

motion to dismiss only "within the last week" before his deposition, even though the order had been issued nearly six months earlier. *Id.* at 79:6-14. When he finally saw the order, he read only "[s]mall parts of it." *Id.* at 79:15-19. Similarly, when shown his own interrogatory responses, Davis first said he had never read them, then clarified that he had not read them "thoroughly," even though he signed them under penalty of perjury. *Id.* at 81:15-22. Davis's failure to take the time to read the entire complaint or his own discovery responses confirms that he is not an adequate steward of the class's claims.

Davis's behavior at his deposition underscores his inadequacy. Even though the deposition was scheduled for a date and time of Davis's choosing, he testified via Zoom on his cell phone while in the middle of a work shift, sitting in a car in his employer's[4] parking lot for most of the deposition and then moving indoors where other employees appeared to be present and working around him. *See id.* at 49:21-25; *see also id.* at 9:7-9, 21:12-18. The fact that Davis could not be bothered to give his full attention for his 2.5-hour deposition confirms that he is either unwilling or unable to devote adequate time and attention to this case.

---

[4] Magna fired Davis in April 2019. Ex. 1, Davis Dep. 56:18-19. At the time of his deposition, he was employed at Stellantis. *Id.* at 52:23-25.

Davis also lacks even rudimentary knowledge about the claims. At his deposition, he could not answer the most basic questions about the claims, instead deferring to his attorneys:

> Q:  Are you challenging any investment options as imprudent in this case?
> A:  I let my attorneys handle that.
> Q:  Are you challenging any recordkeeping fees as excessive in this case?
> A:  Let my attorneys handle it.
> Q:  Are you able to tell me yes or no whether you are challenging any investment options in this case?
> A:  I let my attorneys handle that.
> Q:  Do you know whether any investment options are being challenged in this case?
> A:  I consult with attorneys about that.
> Q:  I'm just asking if you know either way. Yes or no.
> A:  I would let the attorneys handle that.
> Q:  Do you know either way, yes or no, whether any recordkeeping fees are being challenged in this case?
> A:  I don't know either/or.

*Id.* at 71:7-72:1; *see also id.* at 25:14-23, 31:2-15. He admitted that until he was contacted by plaintiffs' counsel, he had never believed there were any problems with the Plan. *Id.* at 63:24-65:17. When asked whether he had ever been dissatisfied with the Plan's investment options, all he could say is: "I wouldn't say yes, and I wouldn't say no. I haven't gave it much thought." *Id.* at 47:24-48:9.

Davis's lack of knowledge of the class's claims, compounded by his failure to spend even minimal time monitoring the case or class counsel, makes him an inadequate fiduciary to the class. *See AEP*, 2008 WL 4210352, at *3-4 (plaintiff

who did not understand a central class claim, did not review key pleadings, and

was unaware of the court's rulings was inadequate).

**B.     King also lacks knowledge of the claims and has failed to monitor counsel.**

King also lacks sufficient knowledge of the class's claims. Stunningly, at his

deposition, he did not even know whether this case is a class action. Ex. 2, King

Dep. at 41:8-19 (Q: "Is [this] a class action?" A: "I would be guessing." . . . Q: "So

is it accurate to say you don't know if this is a class action or not?" A: "I'm

unsure."). He also did not know whether the complaint asserts claims for breach of

fiduciary duty or claims for benefits. *Id.* at 37:7-18. The class's claims span 2014

to the present, but he identified only 2017 to the present as the relevant period. *See*

*id.* at 35:18-36:1. Although King acknowledged that the complaint alleges the Plan

charged "excessive fees," he could not explain what this meant, and admitted he

was not aware of "exactly everything" involved in the case. *Id.* at 36:6-21, 37:14-

18, 46:12-47:19. When asked what he meant by "excessive fees," he suggested that

the class's claims pertained to "filing" fees. *Id.* at 51:21-52:4.[5] Plan participants

who can identify only that an ERISA class action involves "high fees" are

---

[5] Only later in the deposition, when shown his interrogatory responses, did King suggest that the "excessive fee" claims relate to investment options and recordkeeping. Ex. 2, King Dep. 107:16-22, 108:21-109:3. But King admitted that he did not write the responses, *id.* at 103:25-104:7, so all he was doing was reading what his lawyers had written.

inadequate class representatives. *Bell v. Pension Comm. of ATH Holding Co.*, 2018 WL 4385025, at *10 (S.D. Ind. Sept. 14, 2018).

King has also failed to monitor the case or class counsel. Like Davis, he did not review the order on Defendants' motion to dismiss until nearly six months after it was issued. *See* Ex. 2, King Dep. 62:7-63:13. King also relies entirely on counsel to make the decisions in the case, such as which investment options to challenge. *See, e.g.*, *id.* at 59:20-60:3, 64:24-65:3, 78:14-21, 95:25-96:4. King did nothing to investigate the claims that class counsel decided to include in the complaint. *Id.* at 49:3-49:21 (Q: "After Capozzi Adler contacted you, did you do any outside research to confirm that what they told you was accurate?" . . . A: "I basically just—no, I guess, is the answer."); *see also id.* at 59:25-60:3. This level of disengagement from the case disqualifies King from service as a class representative.

## III. Plaintiffs' claims present intra-class conflicts, and their interests are not aligned with those of other class members.

As Plaintiffs acknowledge, they can meet Rule 23's adequacy and typicality requirements only if their interests align with those of the proposed class—in other words, if they "have identical legal and effectively identical financial interests in this action as do the proposed class members." ECF No. 44, PageID.535 (Pls.' Mot. for Class Cert.). Plaintiffs cannot meet these requirements because their incentives diverge from those of proposed class members, as explained below.

14

To begin, Plaintiffs' legal theories create two obvious intra-class conflicts. One pits plan participants who were allegedly harmed by investment options that used revenue sharing (such as participants who, like Plaintiffs, invested in the Principal TDFs) against those who benefited from the Plan's revenue sharing structure. Another pits participants (like Plaintiffs) who never invested in the Invesco Oppenheimer Developing Markets Y fund against other class members who did invest in that fund. Plaintiffs argue that this fund should have been replaced, but some participants were better off using the Invesco fund and would have earned less using Plaintiffs' proposed alternative.

In addition, Plaintiffs invested in only one of the challenged investment options—the Principal TDF suite—and thus lack any incentive to prosecute the class's claims with respect to other challenged options.

All of these issues are incurable, and they prevent Plaintiffs from satisfying the adequacy requirement of Rule 23(a)(4), which "serves to uncover conflicts of interest between named parties and the class they seek to represent," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997), as well as the overlapping typicality requirement. Class representatives must "possess the same interest and suffer the same injury as the class members." *Id.* (internal quotation marks omitted). A representative "cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent."

15

*Yost v. First Horizon Nat'l Corp.*, 2011 WL 2182262, at *10 n.55 (W.D. Tenn. June 3, 2011) (citation omitted). That means the adequacy requirement is not satisfied where proposed class members have conflicting interests with respect to the requested relief. *See, e.g., Amchem*, 521 U.S. at 595 (adequacy not satisfied where class members who sustained asbestos-related injuries sought immediate payment but class members only exposed to asbestos sought creation of a future fund); *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir. 2013) (adequacy not satisfied where some class members sought approval of a settlement while others would lose key evidence in future litigation if the settlement was approved); *Smith v. Babcock*, 19 F.3d 257, 265 n.13 (6th Cir. 1994) ("No class should be certified where the interests of the members are antagonistic, because the preclusive effect of the verdict may deprive unnamed class members of their right to be heard.").

### A.   Plaintiffs' theories of fiduciary breach create intra-class conflicts that foreclose class certification.

In ERISA cases involving duty of prudence claims, courts have declined to certify a class where the challenged conduct allegedly harmed some participants but benefited others. *See Langbecker v. Elec. Data Sys.*, 476 F.3d 299, 315 (5th Cir. 2007) (vacating certification where some "class members made money on their stock fund investments, while others . . . lost money"); *In re Diebold ERISA Litig.*, 2009 WL 9120614, at *5 (N.D. Ohio Mar. 11, 2009) (adequacy not satisfied

in part because some plan participants may have made money on their investments); *Spano v. Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011) (noting that adequacy would be undermined if some class members were harmed by the requested relief); *see also Bell*, 2018 WL 4385025, at *4 (holding that typicality was undermined by a conflict between participants who paid recordkeeping fees above plaintiffs' benchmark and those who paid fees below the benchmark, and narrowing the class to include only the former). The Court should reach the same result here in light of the irreconcilable conflicts between different groups of class members.

## 1. Plaintiffs' revenue sharing theory creates an intra-class conflict.

The Plan lineup included some investment options that paid revenue sharing and some that did not. *See, e.g.*, Exs. 17-19, Fee Disclosures (listing revenue sharing amounts for each investment option). The revenue sharing was used to pay the Plan's recordkeeping fees. *See* Ex. 5, Case Rpt. ¶ 101. Plaintiffs' expert Eric Dyson, however, claims that the Plan's use of revenue sharing was inequitable because it resulted in some participants paying more than others. *See* Ex. 6, Dyson Rpt. ¶ 54. He notes that if a participant invested only in funds that paid no revenue sharing, she paid nothing toward recordkeeping expenses, while if a participant invested only in revenue-sharing funds, she paid more than her allegedly fair share. *See id.* ¶ 53.

17

But Plaintiffs here seek to represent *both* groups; with irrelevant exceptions, the proposed class covers all participants in the Plan. The Court cannot certify the proposed class because Plaintiffs' own theory creates an irreconcilable intra-class conflict. Participants who were in non-revenue sharing funds would be harmed by eliminating the use of revenue sharing, because they would pay more if Plaintiffs win. On the other hand, participants who used only funds that paid revenue sharing, like Plaintiffs, would benefit if Plaintiffs win. That is a classic intra-class conflict. *See, e.g.*, *Prudhomme v. Gov't Emps. Ins. Co.*, 2022 WL 510171, at \*1 (5th Cir. Feb. 21, 2022) (collecting cases and holding that the existence of class members who benefited from the allegedly unlawful action "doomed adequacy").

Moreover, Plaintiffs have not proposed any way to determine whether participants who invested in a mix of investment options were harmed under their "inequitable revenue sharing" theory. Under this theory, there are three groups of participants in the proposed class: (i) participants who, like Plaintiffs, invested only in the Principal TDFs, which provided revenue sharing; (ii) participants who invested only in non-revenue sharing investment options; and (iii) participants who invested in a mix of both revenue sharing investment options and non-revenue sharing investment options. Table 1 represents an estimate of the approximate number of participants in each group for a portion of the class period for which data is readily available:

**Table 1: Number of Participants Holding
Only TDFs, Only Non-Revenue Sharing Options, or a
Mix of Revenue Sharing and Non-Revenue Sharing Options, 2013-2016[6]**

|  | (i) Principal TDFs Only | (ii) Non-Revenue Share Options Only | (iii) Mixed |
|---|---|---|---|
| **2013** | 3,679 | 154 | 15,238 |
| **2014** | 2,678 | 241 | 17,393 |
| **2015** | 5,338 | 244 | 16,344 |
| **2016** | 5,957 | 241 | 16,144 |

Plaintiffs have offered no way to determine which of the thousands of

participants in the mixed group were harmed, which means the proposed class,

even if it were narrowed to cover participants who Plaintiffs say were harmed, is

not ascertainable—another insurmountable barrier to certification. *See, e.g.*, *Davis*

*v. City of Detroit*, 2018 WL 4784661, at \*7 n.9 (E.D. Mich. May 11, 2018) (noting

that the ascertainability requirement applies to Rule 23(b)(1) classes), *report and*

---

[6] For the data reflected in this table, *see* Ex. 13, 4/5/13 Investment Committee
("IC") Materials at 4949-50, 5065-66; Ex. 14, 3/31/14 IC Materials at 3776-78,
3841-42; Ex. 15, 6/30/15 IC Materials at 3586-88, 3650-51; Ex. 16, 5/6/16 IC
Materials at 3348-50, 3409-10; Exs. 20-23, 2013-2016 Form 5500s (Part II.5); *see
also* Exs. 17-19, Fee Disclosures. The "Principal TDFs Only" values were obtained
by adding the number of participants who held a TDF as their single investment
option as of Q1 of each year. The "Non-Revenue Share Options Only" values were
obtained by adding the number of participants whose only investment option was a
non-revenue sharing option as of Q1 of each year. The "Mixed" values were
obtained by subtracting the number of participants who invested in only the
Principal TDFs or Diversified International Separate Account (which used revenue
sharing) or only in a non-revenue sharing option from the total number of
participants as of Q1 of each year. Data is reported from 2013 to 2016 because
these are the only years for which all of this data is available.

*recommendation adopted*, 2018 WL 4179316 (E.D. Mich. Aug. 31, 2018). Making this determination would require complex and impracticable individual calculations for participants in the mixed group—again, yet another barrier to certification.

Plaintiffs' expert conceded the facts forming the basis for the conflict among these groups. He opined that only "*some* Plan participants are negatively impacted by paying more revenue share than others"—specifically, the participants in the first group described above. Ex. 6, Dyson Rpt. ¶¶ 52, 54 (emphasis added). And he admitted that participants who invested in non-revenue sharing investment options—i.e., all the participants in the second group, and some in the third—"had an *advantage*" and were "*better off*" because of the Plan's approach to revenue sharing. Ex. 3, Dyson Dep. 44:24-45:13 (emphases added). This testimony confirms that ascertaining which group each participant is in—as well as whether any given participant in the third group was, on balance, better off or worse off under the Plan's approach to revenue sharing—would be a monumental task. Plaintiffs' expert agreed that "to figure out which category an individual participant falls in . . . you would need to look at [each individual's] investment choices over time." *Id.* at 45:19-46:3. Doing that for each of the more than 20,000 participants in the proposed class, for all periods from April 2014 to present, would be next to impossible. Indeed, neither of Plaintiffs' experts has proposed any way

to ascertain which participants are in which group for purposes of computing damages. *See id.*; Ex. 7, Jones Rpt. ¶¶ 13-23.

The intra-class conflict here is similar to the one that caused the court to deny certification in *Bell*. There, plaintiffs alleged that a 401(k) plan paid excessive recordkeeping fees, but some participants did not pay more than plaintiffs said was reasonable for part of the class period. *Bell*, 2018 WL 4385025, at *4-5. Because those participants were unharmed, the court declined to certify the class. *Id.* Here, many of the unnamed class members undisputedly *benefited* from the Plan's revenue sharing structure. Like the court in *Bell*, this Court should decline to certify a class.

### 2. Plaintiffs' proposed alternative to the Invesco Oppenheimer Developing Markets Y fund creates an intra-class conflict.

Plaintiffs claim the Plan improperly offered certain investment options rather than lower-cost alternatives, and Plaintiffs' expert Cynthia Jones purports to calculate damages based on these alternatives. *See* ECF No. 1, PageID.29-34; Ex. 7, Jones Rpt. ¶¶ 11, 14-19. For at least one of those investment options, however, Plaintiffs' proposed alternative *underperformed* the challenged option for parts of the class period. This creates yet another intra-class conflict, this time between participants who benefited from the Plan's investment option and those who might prefer Plaintiffs' alternative.

The option at issue is the Invesco Oppenheimer Developing Markets Y fund. Plaintiffs say this option should have been replaced at the start of the class period with the American Funds New World fund. *See* ECF No. 1, PageID.31; *see also* Ex. 7, Jones Rpt. ¶¶ 18-23. Yet the Invesco fund outperformed the American fund in numerous quarters throughout the class period even though the Invesco fund had higher fees.[7] *Compare* Ex. 24, Invesco Oppenheimer Developing Markets Quarterly Performance, *with* Ex. 25, American Funds New World Quarterly Performance; *see also* Ex. 15, 6/30/15 IC Materials at 3504 (showing Invesco fund performance); Ex. 16, 5/6/16 IC Materials at 3276 (same); Ex. 4, Jones Dep. 120:5-16 (admitting that the Invesco fund "may" have outperformed the American fund in some periods, and that "[t]here usually are" periodic variations in performance). This means participants who invested in the Invesco fund were better off in those periods and would have been harmed had the Plan instead included the American fund.

A simple example demonstrates this point. Suppose a participant began investing in the Invesco fund in Q1 2017 and then sold her holdings in Q3 2017. That participant would have been worse off if she had invested in the American

---

[7] During the period for which Plaintiffs' expert Cynthia Jones calculates damages, *see* Ex. 7, Jones Rpt. ¶ 20, the Invesco fund outperformed the American fund in Q2 and Q3 2014, Q2 and Q4 2015, Q1 and Q3 2016, Q1 through Q3 2017, and Q1 and Q4 2018.

fund instead of the Invesco fund. *See supra*, note 7. Such a participant would have negative damages. Plaintiffs' damages expert admitted that she did not take this kind of scenario into account because she calculated damages solely by looking at the difference in fees between the two funds, without accounting for the net returns (i.e., performance net of fees) of the challenged fund. *See* Ex. 7, Jones Rpt. ¶ 21; Ex. 4, Jones Dep. 118:20-119:11. She also admitted that her computations include participants who were damaged and some who were not, *see* Ex. 4, Jones Dep. 121:12-15, and that determining whether each participant was damaged would require an individualized determination, *see id.* at 121:2-8.

This is precisely the sort of circumstance that has led other courts to deny class certification in ERISA cases. In *Langbecker*, the Fifth Circuit held that an intra-class conflict foreclosed certification because some plaintiffs made money on the challenged investment option, and the requested relief would eliminate this option for everyone, including those who benefited from it. 476 F.3d at 315. Similarly, in *Diebold*, the plaintiff failed the adequacy test in part because some employees may have made money on the challenged investment option. 2009 WL 9120614, at *5. So too here: Some participants made money from the Invesco fund that they would not have earned had the Plan offered Plaintiffs' alternative instead.

### B.   Plaintiffs lack the incentive to prosecute all of the claims of unnamed class members.

To meet the adequacy and typicality requirements, class representatives

must have incentives that are aligned with the class members' interests. Where a "class representative has no incentives to pursue the claims of the other class members," he does not meet the requirements of Rule 23. *Am. Med. Sys.*, 75 F.3d at 1083.

Plaintiffs assert an investment options claim that requires them to prove that Defendants (i) had a deficient process for monitoring investment options and therefore (ii) failed to identify and remove imprudent investment options. *See Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015). Adequacy is not met here because Plaintiffs lack the incentive to pursue the second step with respect to investment options in which they did not invest. Plaintiffs invested in only one of the challenged funds, the Principal TDFs. *See* ECF No. 45-4, PageID.582 ¶ 5; ECF No. 45-5, PageID.586 ¶ 5. They did not invest in any of the other four options for which Plaintiffs' expert has calculated damages. *See* Ex. 7, Jones Rpt. ¶ 11. As a result, whether Plaintiffs win or lose on the class claims over those four options will not affect their own recovery. They thus have no incentive to litigate those other challenged options and cannot serve as adequate representatives with regard to those claims.

This conclusion is not inconsistent with the Court's earlier ruling that Plaintiffs have Article III standing. *See* ECF No. 28, PageID.342-346. Rather, Defendants challenge whether Plaintiffs have the financial motivation to "fairly

and adequately protect the interests of the class" in light of their personal investment decisions. Fed. R. Civ. P. 23(a)(4). Because Plaintiffs invested in only one option, it does not "appear that the representatives will vigorously prosecute" the class's claims for the other investment options. *Am. Med. Sys.*, 75 F.3d at 1083 (quoting *Senter*, 532 F.2d at 525). For this reason as well, class certification should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification.

Dated: April 14, 2022                      Respectfully submitted,

                                           By: */s/ Mark B. Blocker*

Thomas G. McNeill (P36895)                    Mark B. Blocker
Max A. Aidenbaum (P78793)                     Eric S. Mattson
Dickinson Wright PLLC                         Caroline A. Wong
500 Woodward Avenue, Suite 4000               M. Caroline Wood
Detroit, MI 48226                             Sidley Austin LLP
Telephone: (313) 223-3500                     One South Dearborn St.
tmcneill@dickinsonwright.com                  Chicago, IL 60603
maidenbaum@dickinsonwright.com                Telephone: (312) 853-7000
                                              mblocker@sidley.com
*Local Co-Counsel for Defendants*             emattson@sidley.com
*Pursuant to Local Rule 83.20(f)*             caroline.wong@sidley.com
                                              cwood@sidley.com

                                           *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2022, I caused the foregoing to be electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ Caroline A. Wong</u>
Caroline A. Wong